MANN v. DES MOINES WATER CO.

(Circuit Court of Appeals, Eighth Circuit. January 18, 1913.)

No. 3,684.

1. WATERS AND WATER COURSES (§ 196*)—MUNICIPAL WATER SUPPLY—FRANCHISE—OPERATION.

Where a city, acting under express grant of power from the state, granted a water franchise to a water company which constructed and was operating its plant, the company, to that extent, was discharging a municipal function, and was not only entitled, but it was its duty, to protect its water supply from damage and pollution.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 270; Dec. Dig. § 196.*]

2. WATERS AND WATER COURSES (§ 90*)—MEANDERED STREAM—NAVIGABILITY—RIPARIAN PROPRIETOR—RIGHTS.

Under the Iowa law, the title of a riparian proprietor on a meandered non-navigable stream extends only to high-water· mark; the title to the

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

land under water and to the shore below ordinary high-water mark being vested in the state for public use.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 91; Dec. Dig. § 90.*]

3. WATERS AND WATER COURSES (§ 196*)—MUNICIPAL CORPORATIONS (§ 714*)—NONNAVIGABLE STREAM—MUNICIPAL SUPPLY—USE.

The state, through a municipal subdivision, to wit, a city, has full power to make use of the bed and waters of a meandered non-navigable stream to supply water to the public and to make suitable grants to individuals or corporations to that end, which grant necessarily carries with it the power to protect the works from destruction or injury and the water supply from impairment or pollution.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 270; Dec. Dig. § 196;* Municipal Corporations, Cent. Dig. § 1524; Dec. Dig. § 714.*]

4. WATERS AND WATER COURSES (§ 196*)—MUNICIPAL WATER SUPPLY—POLLUTION.

A municipal water company, under its franchise, collected water in wells by means of galleries which ran from the wells under the bed of a river and about 10 feet below it through the water-bearing sand and gravel under and near the river, through which the water was forced and filtered. *Held*, that the removal of sand from the river over the galleries by teams, each of which removed from two to seven loads daily, threatened damage to the galleries and pollution of the waters entering the mains, which the water company was therefore entitled to enjoin.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 270; Dec. Dig. § 196.*]

5 WATERS AND WATER COURSES (§ 196*)—WATER SUPPLY—POLLUTION—REMOVAL OF SAND FROM FILTER BED—LICENSE.

That complainant water company granted a license to defendant to remove sand from the bed of a river which constituted a filter bed for the city's water supply did not estop the company from thereafter suing to restrain the further removal of the sand on its being discovered that the removal operated injuriously to the filtration and polluted the water.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 270; Dec. Dig. § 196.*]

Appeal from the Circuit Court of the United States for the Southern District of Iowa; Smith McPherson, Judge.

Suit by the Des Moines Water Company against Benjamin E. Mann. Decree for complainant, and defendant appeals. Affirmed.

R. G. Patton, of Des Moines, Iowa, for appellant.

Alonzo C. Parker, James L. Parrish, and William E. Miller, all of Des Moines, Iowa, for appellee.

Before HOOK and SMITH, Circuit Judges, and VAN VALKENBURGH, District Judge.

VAN VALKENBURGH, District Judge. This is a suit in equity brought by the Des Moines Water Company to restrain the appellant, his agents and employés from driving teams of horses upon and removing sand from the bed of the Raccoon river at or near the wells and galleries of the water company upon the ground that these acts threaten injury to such wells and galleries and pollute the water supply of the city.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date. & Rep'r Indexes

The Des Moines Water Company and its predecessors have since May, 1871, operated the only waterworks and water supply system from which the city of Des Moines, Iowa, and its inhabitants receive their water supply. The city council of that city has from time to time passed ordinances to insure the purity of the water and to protect the company's works from injury or damage. These ordinances, among other things, provide:

"That no person shall throw or put into the Raccoon river or any of its tributaries, at any point above where the Des Moines Water Company take water from said river to supply its works, any dead carcass, manure, offal, putrid matter of any kind, or any other substance or fluid which will tend to pollute or render impure the water in said stream, nor shall any person deposit, place or discharge any such substance in, on, or near the banks of said river within five miles, so that the same will wash or flow into said river, nor shall any person bathe or swim in the water of said river within the corporate limits of the city of Des Moines, above said point where said water company draws water for its works."

And further:

"It shall be unlawful to place or deposit any dead carcass, manure, offal, putrid, unwholesome, unclean or offensive matter in, or in such location or place as that it may be carried, wash, flow, percolate, or in any manner reach the Raccoon river or any of its tributaries, at the point or within five miles above the point from which the Des Moines Water Company take or draw water to supply the city.

"No person shall engage in, establish, or carry on any business, occupation, * * * or permit the same to be done on any premises owned or controlled by him, within five miles from and above the point where the Des Moines Waterworks Company take or draw water from the Raccoon river to supply the city of Des Moines and its inhabitants with water, which will in any manner cause such water to be or become unclean, unwholesome, offensive or less palatable.

"It shall be unlawful to injure, damage, or in any way interfere with the works, machinery, pipes, mains, hydrants, trenches or sewers of the Des Moines Waterworks Company."

The state of Iowa has conferred upon its cities authority to grant to individuals or private corporations the power to erect and maintain water plants, and its Legislature has expressly recognized the grant by the city of Des Moines to complainant and its predecessors. It is stated in the bill, and established beyond dispute:

"That in order to enable the complainant to furnish its consumers good, clear, potable water, it is necessary for complainant, instead of pumping directly from the water in said river, to collect the water in wells from which it is pumped by complainant to the mains through which it is distributed. That the water is so collected in said wells by means of galleries which run from the said wells under the bed of the river and about ten feet below it through the water bearing sand and gravel under and near the river, the said galleries being of great length, rectangular in form, and open at the bottom so that the water from the river and water bearing strata, in order to reach the said galleries, is forced through the sand and gravel and is thoroughly filtered."

This is the system employed by complainant, and the water supply of the city is dependent, both as to quantity and purity, upon the use and maintenance of these galleries, and particularly upon preserving in the highest state of efficiency the sand-filtering medium overlying the galleries.

Five suits of a similar nature against divers defendants were consolidated for hearing before the master. His report was approved and decrees were entered granting to complainant the relief sought. The defendant, Mann, alone appeals, contending principally that it was not proven that the defendant had injured or would injure complainant's galleries, or the quantity or quality of the water going into complainant's mains; and further that the decree wrongfully denies to appellant, as a member of the general public, the right to use the stream and take sand therefrom.

[1-3] Through its franchise from the city, acting under express grant of power from the state, the Des Moines Water Company has constructed and is operating its plant. To this extent it is discharging a municipal function, and has not only the right, but the duty, to protect its property from damage, and the exercise of this legitimate function delegated to it, from interference. The Raccoon river is a meandered stream, not navigable in fact; and under the laws of Iowa, which control, the title of a riparian proprietor extends only to high-water mark. McManus v. Carmichael, 3 Iowa, 1. The title to the land under water and to the shore below ordinary high-water mark is vested in the state for public use and benefit. Barney v. Keokuk, 94 U. S. 324, 24 L. Ed. 224. Although it appears that appellee is a riparian owner at the point in controversy, and that appellant is not, no rights here asserted are to be determined by such considerations. The state, through its municipal subdivision, had full power to make use of the bed and the waters of this stream for the purpose of supplying water to the public, and to make suitable grants to individuals or corporations to that end. This grant necessarily carries with it the power by appropriate measures to protect the works from destruction or injury and the water supply from impairment or pollution. It is no denial of the substantial rights of individuals, as members of the general public, to use the waters of a stream and the sand forming its bed, that such rights are subordinated to a public use of paramount importance. Gibson v. United States, 166 U. S. 269–272, 17 Sup. Ct. 578, 41 L. Ed. 996; Scranton v. Wheeler, 179 U. S. 141–151, 21 Sup. Ct. 48, 45 L. Ed. 126.

[4] To support the judgment and decree of the trial court it remains only to consider whether it sufficiently appears from the record that the operations of appellant threatened damage to complainant's galleries and pollution of the waters entering its mains. Of this we entertain no doubt. Defendant employed as many as five teams in this work for a period extending from August to November, 1909, and each team removed from two to seven loads of sand daily. There was ground for apprehension that the continued digging, excavating, and removal of sand above and in the immediate vicinity of the galleries would weaken and damage them. But a still more serious menace was the impairment of the sand-filter through which the water percolates into the galleries and finds its way, in large measure freed from impurities, into the wells and reservoirs. It conclusively appears that in the operation of this filter the most important agency of purification is the upper layer of six inches, and, perhaps, a little more.

The benefit of this layer is not secured in a necessary degree until after it has been in operation for some time. If the surface is disturbed or loosened by digging into it, the rate of filtration is increased, and the filtering capacity correspondingly reduced. Add to this the deposit of filth and excrement in appreciable quantities from large numbers of men and beasts working in and above these waters and sands communicating with the galleries—sands whose filtering capacity had been and was being lowered by excavation and depletion on a large scale—and the dangers which threatened the water supply of a large community become at once apparent. The testimony shows that this danger was not theoretical merely, but actual. At the time when the operations at which these injunctions are leveled were at their height, analyses of the water by the State Board of Health disclosed an alarming increase of bacteria. After this work was stopped, the water gradually returned to its normal condition. All this was quite sufficient to support a finding that such operations at the source of the water supply of the city should not be permitted. In the face of imminent danger to life and health, considerations of individual interest must always yield. It was the duty of complainant, and of the court, to protect the public. Such action was in harmony, not only with plain principles of equity, but likewise with express municipal regulations.

[5] We agree with the master that it can make little difference whether or not complainant at any time gave defendant permission to remove sand at or near this point, or whether complainant itself employed similar instrumentalities in repairing and reconstructing its plant. Whatever complainant did in the latter particular was obviously necessary to maintain the water supply; and no license, if any, granted to defendant, could estop complainant from protecting that supply when injury, actual or threatened, was discovered. The master found that the defendant acted with no wanton purpose of injuring the galleries or of polluting the supply of water; that he exercised more care than the others in making his excavations and in preventing the accumulation of filth. It is conceded that opinion may differ as to the damage resulting from the individual operations of appellant. Nevertheless, where the purity of the water supply of an entire city is involved, all doubt should be resolved in favor of the public safety. The court, out of consideration for these findings, while granting the injunction, taxed the costs against the water company. This very proper exercise of discretion should leave no room for complaint.

It follows that the decree of the Circuit Court must be affirmed.